Our case this afternoon is King v. Eon Labs, and Mr. Levine, you may proceed. Thank you. Good afternoon, Your Honors. There are three issues that I want to briefly discuss during the oral argument here today. One is an issue of law as to whether the district court, as we believe, erred on the question of whether the so-called half-life prior art references are material. The second question being whether the district court, as my brethren on the other side contend, did in fact decide the question of intent against Eon on the issue of the half-life references. And then lastly, the question of whether Eon was a materiality question of the half-life references. The patent in suit is directed to claims that are very simple. They claim taking a drug metaxalon with food. And in a prior decision of this court, this court found all the claims of the patent, the two patents that were involved, invalid for anticipation. Over these particular references? Not these particular references. Over other references. The so-called with food references. Different set of references. Okay? So what is your basis for asserting but for materiality? Well, the judge below, after Your Honors ruled that the patents were invalid, the judge below had reserved on the question of exceptional case. And we went back to the judge, but the judge held until Your Honors ruled. And when he ruled, he then issued his decision. We had argued below that two sets of references established were material and either set, that is the with food references or the half-life references, were sufficient to establish a case of materiality of withheld references. He found in his decision that the with food references were material, and those were the same ones that Your Honors invalidated the patent on, and he found that the half-life references were not material. Now, on the half-life references, we believe he made an error of law in making that determination, as follows. There is no question that the patent itself reports that when you take metaxalon, this drug, with food, you get a half-life of 2.37 hours. And when you take it without food, it's nine hours. So there's like a six-and-a-half-hour difference in the half-life of the drug. And I think you may know, but the half-life represents the time it takes for the drug to clear the body or half of the drug to clear the body after it reaches a steady state inside the body in the bloodstream. Now, the court specifically found that there's no other explanation, no other known explanation for the fact of that differing half-life between two-and-a-half hours and nine hours, other than the fact that you've taken the drug either with or without food. That's a specific finding made by the district court on page, I think, it's 825 of the district court's opinion below on this issue. We submitted references to the judge saying, well, there's prior art out there showing that the half-life of methaxone is known to be two to three hours. And based on the conclusion that the only explanation for that is that it was taken with food, that evidence is of public use. The district court addressed that question, but found that because the person of ordinary skill would not have appreciated that methaxone was taken with food because no one knew that until they carried out the study that showed that, therefore, it could not have been of public use. And it's our position that that's a misunderstanding or a misstatement of the law of public use. The law of public use, as we understand it and as articulated as far back as 1881 by the Supreme Court in the Egbert case, doesn't require appreciation of the fact that the public use took place. So, for example, in the Egbert case, a lady had invented a corset stay, and she gave the corset stay for two weeks. I teach this case. OK. The inventor tore it out of the dress and showed it to another member of the public. The public did appreciate that the dress corset was inventive, and he was bragging about it during the public use period. That is true. Those facts are also present in that case. But the case stands, I believe, clearly for the proposition that it's the actual public use that defeats patentability. Not the fact that anybody necessarily appreciated it, but that the invention was in public use and the rationale being that you can't take out of the public domain something that was already being used by the public, whether or not they appreciated it. Even if you get by this, how do you get by intent? I will go to that next. Intent, we believe, Your Honor, has to be addressed by the district court because it has not yet been addressed. My opposing counsel says that the district court specifically addressed the question of intent with respect to all of the references, including the half-life references. We believe that a reading of the district court's opinion makes it crystal clear that that is not, in fact, the case. If you go read the district court's opinion, what he did was he analyzed the materiality first with respect to both sets of references, which he considered separately. He considered the with-food references, and then he considered the half-life references. And then when he gets down to, after discussing all of the references on page 827 of his opinion, he then starts by saying that since there was a failure to disclose the with-food references, which I find to be material, I have to consider the intent element with respect to those. And he then specifically talks about those with-food references. He never talks about the intent issue with respect to the half-life references because he had found they weren't material. And he felt, therefore, he didn't have to reach the question, which under his analysis was certainly correct. And we believe that under this Court's holding in the Golden Hour case cited in our brief, I think it was last year in 2010, the appropriate remedy there is to remand it to the district court for determination on the issue of intent. I'm looking, of course, at where he specifically says Eons failed to meet his burden of proving that they withheld these references with intent to defraud. Right. Where are you, sir? On page 831. OK. Yes. That could be limited to the with-food references. But if the with-food references don't have intent, the more attenuated other references also have to be, wouldn't they be logically found in the same lacking intent category? If the district court considers the question, is there the possibility that the court would still find certainly there is. But the references are in different categories with respect to each other. One of the bases on which the court found that the with-food references were not, there was no intent with respect to those because the information was contained in a paragraph in the reference, and there was no evidence that the court found that they had read those particular passages. And that certainly makes sense. The court found under those circumstances, I don't think I can find intent under these categories. The with-food references are different because these were their own advertisements. It wasn't like something buried in a reference. They had ads that they were putting out that said the half-life of the tax fund is two to three hours. This was before they ever filed. Old ads that were clearly disseminated throughout the company. One of these inventors was the head of regulatory responsible for submitting these very ads to the FDA. So we think these references fall in a very different category. And the analysis of intent with respect to these might well lead to a different outcome than it did with respect to the with-food references. Now, I'd like to go on just briefly if I could to the prevailing parties. Yeah. Thank you. On the issue of prevailing parties, the district court found that Ian was not a prevailing party as to Eli. There was no question we were a prevailing party as to King because we invalidated the patents. And I think you know maybe from the history of the case and the briefing that there was originally a 400 milligram action. Then there was an 800 milligram action. And Elon was in the 400 milligram action. And this court found on the last appeal of this case, the same case where you invalidated the patents, that in fact, based on filings that Elon had made in the district court back in 2003 and 2004, briefs that had been filed in the court, that that did constitute a sufficient covenant not to sue to divest the court of jurisdiction. And our argument here is that Elon, having made that argument to the appellate court and had succeeded in the previous case as a basis for saying we shouldn't be in the case, they are now bound by that finding that that covenant divested the courts of jurisdiction. And under the court's precedent here in the highway equipment case, for example, this court has held, and I acknowledge that that case was with prejudice dismissal, but the principle of the case was that because there was a covenant not to sue given by one party to the other in the context of the litigation, not something outside what they called extra judicial, but there was actually a covenant that was submitted to the court with the clear intent that it be enforceable. They said that was enough to put a judicial perimeter on it to satisfy the prevailing party requirement and found that the party was in fact the prevailing party. So we believe that based on that covenant- Let me go back just for one second to the intent requirement, which is a big leap for me. You're trying to say because there were a few advertisements that put forth the half life requirement that the inventors were supposed to have known that this was related to food and known that with enough particularity that they intended to defraud the patent office by withholding that information? Well, in terms of their knowledge- It seems like there's about three very difficult hoops there for you to jump through. But with respect to their knowledge, Your Honor- Did they even know about the ad? If they knew about the ad, did they know enough about it to understand that withholding it was but for material? Three, did they do that with intent to deceive when they didn't apparently even know of the ad or of what it meant? You're exactly right. Those are the questions. We believe that those questions, though, should be answered by the district court under the golden hour. First of all, when we all briefed this here, nobody was aware of the Theresex case, which hadn't come down. That clearly has changed the landscape, and we readily acknowledge that. And we realize that the burdens we're going to have if we elect to pursue this when it gets below are very different than they were when we briefed this- But what in this record even puts those questions into dispute is what I'm asking. Well, when you say this record, again, we didn't address the question of intent with respect to the with food references specifically on this appeal because the district court did. The district court in our view only addressed the with food, and therefore there was no reason for us to address it. And under your ruling in golden hour- But he did make very clear findings that they had no awareness of the articles, and they had no awareness that those articles had any impact on their patent. With respect to the with food references, I think what he said was that he finds it hard to believe that they didn't look at them because their testimony was we didn't read any references on the tax law. And yet, you don't have to look any further than the background section of the patent where they're citing references on the tax law. So he was skeptical of that, but he primarily based his opinion as I read it on the fact that the passages talking about with food were in a paragraph in a long reference. That's not the case with the two to three hour half-life references. They clearly knew that the reason that you got a two to three hour half-life was because you took it with food. It's right in their own patent. In fact, they say that's the reason in column six at lines 29 to 33. They give that as the reason. So they knew that. They knew about these ads. It's not the same category as these articles, and they clearly did not provide them to the patent office. I'd like to reserve a little bit. Thank you. Welcome to any- No, okay. If you have a final thought, we'll give you your rebuttal time back too. Okay, I appreciate that. Okay, good. You may preserve then. Thank you, Mr. Devane. Thank you. And if you'd give, well, when you split the time up, I don't know how to do this, but let's give Mr. Cerrito an extra three minutes if he needs to use it. Okay. You may proceed, Mr. Cerrito. Good afternoon. May it please the court. I'm Dominic Cerrito from Jones family out at the king parties. Before I begin, I'd just like to dedicate this appeal to my colleague and good friend, Daniel Malone, who recently passed away suddenly last month. Your Honor, just to hit that very last point that you asked, Mr. Devane cites to our patent saying we knew exactly what we were talking about when it came to the half-life and with food. He cited you to passage at 8149, column 6, line 29. You talk about half-life, but the very next sentence, Your Honor, says the exact reason for this discrepancy between the two-hour and the nine-hour is unclear. It shows he exactly did not understand the relationship here. Even when questioned during their deposition, the inventors both do not see any materiality to the half-life issue. They weren't able to convince him. Mr. Devane was not able to convince him in their deposition it has any materiality. At the end of the day, Your Honor, when it comes to materiality, Mr. Devane is not pointing to a single thing the district court did in error. There's not a single finding that he can point to and say that was an error. The 102B argument that he makes on public use is an argument he made for the first time on appeal. He never heard that before. It was never a basis to find the patent invalid or obvious. Just one quick comment on that as well, Your Honor. All the public use cases that we've seen, and certainly the ones he cited, I'm not aware of any, at least one person knows about the public use. At least one. Typically the inventor. Here we have a situation where no one understands it was a public use because the inventors didn't understand that they were using any invention. Let's remember what the invention in this case was. The invention in this case was a method of increasing all patent availability, how much your body can absorb of a drug, by taking a drug with food. And to be fair, patent is ultimately struck down as invalid on inherency grounds. But it doesn't happen as our prior case law would dictate each time and every time. It happens about 70% of the time under the correct conditions. Under different conditions you won't get that increase in all the patent availability. Catholic had nothing to do with this. Had nothing to do with this issue. When we talk about intent, Your Honor, I think I have to go right to the point that you cited. The specific findings of intent are such that they apply both to the half-life and the food effect references. Why? Because the specific finding that they cannot escape, which they cannot challenge, is that the district court found neither Skate nor Shaw, the two inventors in this matter, ever saw the references. They never saw them. There was no finding that they were untruthful, that their credibility was in question. They never saw them. So even under the old standard they don't survive. But let's talk about their sense. Okay. Even if you say, well, maybe they saw them. In other words, they did. Now we have to go to the next step. Did they understand them to be material? As I started my discussion this afternoon, depositions in this case specifically show they still don't think they're material. It's not simply easy to say half-life equates to with or without food. How do I know that? Because their experts said so. Our experts said so too. But both sides' experts say you can't just simply say that half-life is X if you take it with food and Y if you don't. There's a lot of factors that go into what a half-life looks like. Both sides agreed. The inventors agreed. So simply saying that they might have seen it, which there's no evidence that they did, and the fact the finding was that they did not, that they then had to make this leap of faith that somehow they understood it to be material, absolutely no evidence there. In fact, the evidence is quite to the contrary. And the third part of their assessment, of course, required them to withhold it with deceptive intent. No more possibility. There's no finding. There's no rulings. There's no nothing on that issue. They did not elicit a single piece of deceptive intent evidence throughout the case. With regard... Again, on the public use issue, on materiality, it's but for materiality. I think the one thing that's important there, besides the fact that there's just no finding being challenged here, is under but for materiality, one reference that they're pointing to that's most important. It's called Ellenbos. Ellenbos' data appears in all the other references they cite to. So they're really human. It's one reference. That reference was cited in the prosecution of the second patent suit. So there's two patents, the 128 patent and the 102 patent, claimed substantially identical. It was cited to the patent office. They need environmental rejection. Not human rejection. But for materiality cannot be established in this case. The court's findings on materiality, while Mr. Levin cites to certain statements about how relevant he thought it was, the court ultimately found that there was no materiality. And there was an issue about whether or not the correct legal standard was applied. And again, the legal standard has since changed. But the correct legal standard was clearly applied at A-15 and A-19. The court cites the standards. These are reasonable, as I understand it. They weren't even going to meet that burden. They certainly cannot meet the new burden under Therese's. But the court found, specifically, it would not have been obvious to someone of ordinary skill and knowledge that those studies, disclosing the half-life references, were conducted by administering taxonomic food. That was a specific finding. They cannot challenge it. They have not challenged it. Without information, and again, the only thing they challenged on materiality was a standard, a burden proof, with regard to whether or not the judge applied reasonable, as I understand it. That's all they challenged. They didn't challenge the underlying findings. The court also found, without information about the taxonomist's terminal half-life in both the Fed and FASTED states, it would have been impossible for someone of ordinary skill to determine whether studies were conducted in the Fed standard. Impossible. This is the same judge that they don't challenge with regard to the underlying findings, only the burden of proof, only the reasonable legal standard that was applied. And again, I implore the court to go back and look at A-15 and A-19, where the court specifically sets forth the legal standard, specifically sets forth the reasonable examiner standard. Also, one last case, Your Honor, and then I don't want to delay this any further, but with regard to the intent findings, the arguments made below by the- Did the judge actually make intent findings on the half-life references? I would say they did, Your Honor. Well, he didn't at least explicitly. And if he didn't do it explicitly, it is intensely factual. Should we send it back? No, Your Honor, and let me tell you what I meant by that. Yes, there's no heading that says intent factors with regard to half-lifes. There's no heading that says that. But he did find that the inventors didn't read any text on references. So if they didn't read them with regard to tape with food, they didn't read them with regard to half-life. They didn't read them. End of story. They have no specific knowledge of the reference. That ends this inquiry. With regard to the other intent factors- Well, does it? The Fox case and other cases have found that intent can extend to the prosecuting attorney, and why wouldn't we perhaps extend intent beyond to the corporation as a whole? They certainly knew what they were doing. Did they have an obligation to convey that to the prosecuting attorney so that there would not be a withholding of information? To an extent, that is a possibility, Your Honor, and I wouldn't differ with you on the exact case law on that issue. Well, I'm not saying that's the case law. I'm putting forth factual scenarios that I'm wondering if we have to inquire into. I guess the short answer is that they never raised those issues, and they can't do it for the first time in a period. And they should not be allowed simply to raise a new case and to argue a new case. I think that's made it clear that the actual specific knowledge needs work, and they've never established anybody with that specific knowledge of these reliances. So I think setting it back from that would just start this case all over again and appropriate. The other intent findings that have been committed, and it's a little- the way that they argued it below, quite frankly, there was three points. So Your Honor may recall from the briefs that there was alleged failure to disclose things during the petition to make special, alleged failure to disclose things to the FDA. Those arguments went to both issues. They made one set of arguments to both issues. The judge ruled on them in one ruling. He didn't separate them out, say, now I'm ruling with regard to half-life, and now I'm going to rule on the same issue with regard to food. So those findings, those intent findings, were made for both. They made the arguments together. The judge ruled on them together. So I do think there's more than just the examiners didn't see the reference. I think there is additional findings that can support the district court's conclusion. Regardless, at the end of the day, Your Honor, under the new Theracent standard, the remand is futile here. There is simply no materiality. There's a challenge to the underlying facts and materiality here. And with regard to intent, there's- it's clear that there were some other references. Those findings have never been challenged. Thank you, Your Honor. Okay, thank you, Mr. Cerrito. Mr. Monroe. Good afternoon. My name is James Monroe. I'm here on behalf of the Lawn Pharmaceuticals. My comments will focus first on the jurisdictional and preventative party issues. Those impact a lot in this case. And we believe they're important issues, not only for this case, but also for any cases involving patents which were previously owned by others. With respect to the 800-milligram case, which forms the basis of this appeal, there was no question that the district court lacked jurisdiction to decide any issue as to a law in view of the court's prior decision. Previously, this court decided that the district court lacked jurisdiction to decide any- the eons in validity claim against a law. And we contend that that same reasoning applies to eons exceptional case requests based on alleged inequitable conduct. It doesn't seem appropriate that a patent infringement defendant can assert an exceptional case request against a third party over which the district court has no jurisdiction to decide. So you're saying that if there was, in fact, inequitable conduct, there's no one who can challenge it? No, Your Honor. Eon can challenge inequitable conduct against the party asserting patent, but not against the prior patent owner. They can seek discovery of the prior patent over owner, which was done here, obtain discovery, and look into that issue just like they did in validity. But ultimately, the district court, as this court previously held, didn't have jurisdiction to hold invalidity against a law in the 800 milligram case. And we would argue the same applies here. With respect to the 400 milligram case, it's interesting eon is only asserting error by the district court with respect to the law, not with respect to King. And eon is basing its arguments solely on the covenants referenced in this court's prior decision. If we go back and look at this court's prior decision, the court first pointed out that the asset purchase agreement and all the other agreements between Elan and King in June of term 2003 unambiguously transferred all rights to King. And from that point forward, Elan had no rights in the patents. The court's exact language was that the covenants, which Elan repeatedly gave, because eon did not believe Elan that they had no rights, Elan repeatedly gave covenants, and the prior panel said those confirmed what was already clear from the agreements, that all rights were transferred. With respect to the case law that eon cites in support of its prevailing party theory under a covenant concept, those cases are factually very different than what we have here. In those cases, the court was looking at the extermination or termination of a legal claim against a party. That's not what happened here. What happened here with Elan, so all its rights to King, was equivalent to a Rule 25 substitution. Elan no longer was a proper party in the case. There was no termination of any legal claim against eon. Eon did not prevail on any legal claim. Rather, King stepped into Elan's shoes and continued to pursue those legal claims until eon unilaterally withdrew its 400 milligram product from E&DA review and thereby terminated the jurisdictional basis. But he did that without prejudice, right? The suits were withdrawn without prejudice. That is correct, Your Honor. After eon withdrew its 400 milligram from E&DA, there was no jurisdictional basis for the case at all. The district court so found, and eon doesn't challenge that finding, that it was its actions which caused that case to disappear. But they can still return and sue, being that the suits were dismissed without prejudice. Well, King could move forward and pursue perhaps again, except the claims have been passed and held valid. Elan never could. Elan transferred all rights. So again, eon didn't prevail as long on any legal claim of those cases that the Covenant relate to or address. Under their analysis, any time there's a Rule 25 substitution of parties, the other side has a right to seek claims against the party that got substituted out. And that just can't be right. With respect to the merits of the case, I wanted to just briefly touch upon materiality of my intent and a few of the comments that were made by Mr. Pavane. First, as Mr. Cerito noted, there was no allegation below the court did not decide invalidity based on a public use. Eon is simply trying now on appeal to have this court have fact findings with respect to public use for basically invalidity purposes in the guise of an intractable conduct claim under the umbrella of a 285 claim. And quite frankly, we think it's inappropriate for the court to even address jurisdiction of the 285 claim as far as intractable conduct is concerned, because that was something that Eon had given up and dismissed the counterclaims. And we don't believe there was a full vetting of that issue that would have been appropriate. We agree with the court's findings, but we argue from a jurisdictional standpoint there was no basis for the court to even consider inequitable conduct at that stage of the case. As Mr. Cerito noted, there's no unique evidence with respect to intent with respect to the half-life references. And I would like to note one point in the district court's decision which further highlights that the district court is making a general intent finding. Specifically, at 833, after the district court went through a lot of evidence that Eon had alleged showed some sort of nefarious activity by Elan, the district court stated, Eon has failed to prove by clear and convincing evidence that applicants contemplated using illegitimate means to forestall generic competition from, I misquoted it, to forestall competition from generics. That was a final sort of holding about the applicants and what their intent was. And he found, and that's not been challenged, that finding is not been challenged, that there was no intent by the applicants to deceive the patent office. I would like to comment also just briefly, the district court did note repeatedly and found credible that the inventors had not read any taxon references. And they've argued that that seems uncorrectly credible. But we believe that's a credibility determination that should be undisturbed. And actually, the evidence of both sides supports that the inventors were not reviewing references. And therefore, they can't even get through that first hurdle of knowledge and to the second hurdle that they would believe it was material. And definitely, given the court's findings, they can't, even if we remand it, get to an intent to deceive the patent office. Thank you, Mr. Malone. Mr. Levine, you have your entire four minutes. Thank you. I appreciate that. Let me just address a couple of things that Mr. Monroe said first. First, it's important, I think, to remember here that the party of inequitable conduct was committed. It was committed by Elon, no one else. And the other ones were saying, we should not be held responsible because we transferred out in the case of David Altkin. But on this issue of intent, I think that Mr. Monroe's argument highlights the slippery slope of looking at the opinion and saying that when the judge addressed the intent issue with respect to the with food, it should also slough over into the question of the half-life references. You can't do that. The reference that he pointed you to on page 33 of the judge's opinion, he was addressing specific emails that we had pointed to that had an anti-competitive tone talking about throwing grenades in the front of generic competitors, keeping them off the market at all costs. And the court was simply saying there, OK, maybe they said that. But you know what? That's not anti-competitive in and of itself. And it's very clear from the discussion that appears before that that he was only talking about with food. And in fact, if you look at page 830, they say that the testimony was clear that the judge believed in that. Did you, as Mr. Cerrito suggests, not separate the half-life and the other references, the with food references, but just present a generic intent to the judge so that he would give a generic answer? No, absolutely not. In fact, when we addressed them, we addressed a different context in which each of those references were available to the inventors. Did you ever suggest to the judge that there would be a distinction between intent findings for either of the references? In those exact words, no. What we did say, though, was we pointed out why there was intent with respect to each category of reference we were asserting. So to that extent, yes, of course we did. Because the facts were different with respect to each of the categories of references. They were very different with respect to the half-life. As I mentioned, they were advertisements. These were things that they were submitting to the regulatory authorities, the FDA. You have to submit all your ads. These same gentlemen, the inventors, were submitting them. And then they said, but we have no knowledge of why. Well, I want to address that. Because that's a misreading of the patent. What the patent says, if you look at Column 6, that Mr. Cerrito cited to, it says exactly, the mean half-life of metaxone with and without food were 2.37 and 9.4, respectively. The exact reason for the discrepancy is unclear. However, the AUC last, area under the term last, is outside the confidence interval, indicating a significant food effect. So what they were saying is, we don't know why you get this difference in half-life with and without food. But there clearly is a significant one. It doesn't say what Mr. Cerrito said, that we don't think this is the reason it's happening. Quite to the contrary, they were recognizing this was the reason. And in fact, the district court, in its opinion, specifically found there is no other explanation in the record for why that would happen. Now, also on the issue of the judge believing their credibility, that they never saw the references. That's really not true. Again, and this is, again, the slippery slope. Page 830 of the district court's opinion. He says, a rare list of evidence submitted by the defendant strongly suggests that Scaife and Shah, the two main defenders, were generally aware of at least some of the material references. The evidence does not show that either of them reviewed the actual articles in such detail so as to be aware that they were advised that taking a tax loan either with food or after meal. If you're generally aware, do you suppose you'll have enough intent to deceive the PAC office? No, I don't. And I think that's what the basis of his ruling was, that the language about with food was buried in a reference. It was a publication, one of these scientific publications. And it was in a paragraph in there, or somewhere wasn't readily apparent. That's quite different than these half-life references, where it's right there. It's one page. It's an advertisement that they're submitting. And it says, question, what is the half-life of the tax loan? Answer, two to three hours. It's not something where you can argue that they weren't aware of it. It was directly there. So again, these are very different arguments with respect to the two sets of references. And also, just briefly, to the argument that we didn't make these arguments below. Yes, we absolutely made these arguments below. Why did we argue it? But it goes on to say, defendant did not meet its burden of proving he was untruthful in saying he hadn't seen these articles. He fines against you point time and time again. Yes, he did. He did. There's no question. On those references, he did, Your Honor. I can see that. I don't dispute that. Have a final thought for us, Mr. Bain. The final thought is that when we made the argument for anticipation on the prior appeal where your audience found the patents invalid, we, I think it's all good appellate should do, chose our best argument in terms of the art. We had a clear anticipation based on the with food references. So we presented that to your audience. But we never waived our right to argue that the half-life references were material. And in fact, to the contrary, what we had argued, even before the case went up on appeal, all the briefing on exceptional case have been completed. And we had argued both sets of references for the exceptional case part. So we always argued that alone. That's all I have. Thank you. Thank you very much. That concludes our afternoon. All rise.